## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

ADAM WAPNIAK, R.A.,                                 :        **No.: 1:17-cv-02799**

                                                    :

                    Plaintiff,                      :        **COMPLAINT**

                                                    :

                    -v.-                             :

                                                    :        **JURY TRIAL DEMANDED**

THE CITY OF NEW YORK, FIRST DEPUTY     :
COMMISSIONER, ERIC BRETTSCHNEIDER in   :
his individual and official capacities, DEPUTY    :
COMMISSIONER, MITCH GIPSON, in his     :
individual and official capacities, DEPUTY    :
COMMISSIONER, SUSAN NUCCIO in her      :
individual and official capacities, DEPUTY    :
COMMISSIONER, JOSEPH CARDIERI, ESQ., in his   :
individual and official capacities, DIRECTOR OF   :
EMPLOYMENT SERVICES, WILLIE MAYE, JR.   :
in his individual and official capacities, ASSISTANT   :
COMMISSIONER FOR FACILITIES, ANNA COLARES   :
in her individual and official capacities, CHIEF OF   :
STAFF TO FIRST DEPUTY COMMISSIONER,   :
DEBORA MACK in her individual and official   :
capacities, and JOHN AND JANE DOES NOS. 1-10,   :

                                                    :

                    Defendants.                     :

------------------------------------------------------------------------x

Plaintiff ADAM WAPNIAK ("Plaintiff"), by and through his attorneys, KLEIN

SLOWIK PLLC, as and for his Complaint, alleges as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff ADAM WAPNIAK was hired to clean up construction procurement and

payment processes for New York City's Administration for Children's Services after many failed

audits. Despite this mandate, ACS resisted Plaintiff's efforts and impermissibly fired him for

doing his job.

2.      The City of New York, acting by and through its agencies, must ensure that it

complies with applicable laws, rules, and regulations, including, without limitation, the New

York City Administrative Code (the "Code"), and the Rules of the City of New York (the "RCNY"), in all of its activities, but specifically, as here pertinent, the execution and fulfillment of construction contracts, and payments therefor to vendors and contractors through the City's Financial Management System ("FMS").

3.      Defendant, CITY OF NEW YORK (the "City"), through its much-embattled Agency, the New York City Administration for Children's Services ("ACS"), did so poorly in this regard that, pursuant to a 2015 internal corrective action plan, in response to Directive #7 of the Internal Controls and Accountability Directives of the New York City Comptroller (the "Comptroller"), dated July 5, 2011 and reaffirmed on June 3, 2015, the position of Engineering Audit Officer ("EAO") was created at ACS.

4.      As per the order of the Comptroller, the remit of the EAO was to keep watch over ACS' processes and procedures for fulfillment of construction contracts for ACS projects, by auditing the execution of contracts in the field, measuring the activities of contractors against schedules and budgets, approving payment to contractors as warranted, ensuring compliance with protocols, and guarding against waste of public funds.

5.      On or about May 16, 2016, ACS hired Plaintiff ADAM WAPNIAK, a Registered Architect licensed by the State of New York, to fill the EAO role on a provisional basis.

6.      Immediately upon assuming the EAO role, upon investigation of ACS construction contracts, Plaintiff noticed shady payment practices, favoritism in the execution of contracts, failure or neglect to hold contractors accountable for meeting budgets and schedules, substandard quality of work in the field, and other irregularities.

7.      Plaintiff brought these to the attention of Defendants, as per his job description and intended role, and in compliance with the directive that the Comptroller had issued to ACS.

8.      However, instead of heeding Plaintiff's warnings regarding these abuses and failures, Defendants suppressed Plaintiff's audits and eliminated the EAO position.

9.      On or about June 17, 2016, in retaliation for Plaintiff's whistle-blowing, the Defendants demoted Plaintiff into a permanent architect position, and provided him with a probationary period.

10.      As a result of his demotion, Plaintiff immediately sought whistleblower protection by filing a complaint with the New York City Department of Investigation ("DOI")

11.      A week later, on or about June 24, 2016, in retaliation therefor and for raising concerns as described above, Defendants fired Plaintiff.

12.      Regulatory officials are supposed to enforce the law, not ignore it and defy it; yet that is what Defendants herein did, when they stripped Plaintiff of his valuable professional position, under color of law but without any of the due process to which Plaintiff was entitled.

13.      The individual Defendants, all of whom are high-level officials at ACS, showed contempt and disdain not only for the constitutional rights of Plaintiff, but also for the laws and rules that they are sworn to enforce, when they terminated his employment despite his whistleblower status, as well by as doing so without providing formal charges or the administrative hearing to which Plaintiff was entitled.

14.      Moreover, the Defendants wrongfully discharged Plaintiff in violation of the applicable whistleblower protection act.

15.      As a result, Plaintiff brings the within action, pursuant to 42 U.S.C. §§ 1983 and 1988, in which he seeks relief for injury to his civil and legal rights, in violation of the United States Constitution, by Defendants THE CITY OF NEW YORK, FIRST DEPUTY COMMISSIONER, ERIC BRETTSCHNEIDER in his individual and official capacities,

DEPUTY COMMISSIONER, MITCH GIPSON, in his individual and official capacities, DEPUTY COMMISSIONER, SUSAN NUCCIO, in her individual and official capacities, DEPUTY COMMISSIONER, JOSEPH CARDIERI, ESQ., in his individual and official capacities, DIRECTOR OF EMPLOYMENT SERVICES, WILLIE MAYE, JR. in his individual and official capacities, ASSISTANT COMMISSIONER FOR FACILITIES, ANNA COLARES, in his individual and official capacities, CHIEF OF STAFF TO FIRST DEPUTY COMMISSIONER, DEBORA MACK and JOHN AND JANE DOES NOS. 1-10 (collectively "Defendants").

16.     Moreover, Plaintiff brings a claim pursuant to New York State Civil Service Law ("CSL") 75-b, in which he seeks relief for injury to his civil and legal rights for terminating his employment for exposing the improper practices at ACS.

17.     Finally, he brings a state law taxpayer action to remediate Defendants' waste of the public fund.

## JURISDICTION AND VENUE

18.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fifth and Fourteenth Amendments to the United State Constitution.  Jurisdiction is conferred upon this Court by Court by 28 U.S.C. §§ 1331, 1343 and 2201, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

19.     Plaintiff invokes this Court's pendant and supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all New York state law claims herein as against all parties.   The New York state claims alleged herein arose from a common nucleus of operative fact and are so related to the claims in this action within the original jurisdiction of this Court such that they

form part of the same case or controversy, and would ordinarily be expected to be tried in one judicial proceeding.

20.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 in that Defendant CITY OF NEW YORK (the "City") is administratively located within the Southern District of New York, and the events giving rise to this action occurred within the boundaries of this District.

## NO CONDITIONS PRECEDENT REQUIRED ON STATE WHISTLEBLOWER CLAIM AND RESERVATION OF RIGHTS

21.     With regard to a state whistleblower claim, pursuant to Civil Service Law § 75-b and/or Labor Law § 740, there are no conditions precedent to maintaining this action.

22.     There is no notice of claim requirement for sustaining a claim pursuant to Civil Service Law § 75-b.  See Castro v. City of New York, 141 A.D.3d 456, 458 (1st Dept. 2016).

23.     With regard to Plaintiff, the City has expressly admitted as much.

24.     With regard to remaining state claims, Plaintiff has filed a petition, under New York County Index No. 158871/2016 to file a late notice of claim to the City of New York pursuant to General Municipal Law § 50-e with regard to potential torts which stem from a common nucleus of operative fact and are so related to the claims in this action within the original jurisdiction of this Court such that they form part of the same case or controversy, and would ordinarily be expected to be tried in one judicial proceeding, however such a condition precedent is necessary to commence such torts.  Therefore, Plaintiffs reserve their right to amend their complaint to add such claims once such a condition precedent is complete.

## JURY TRIAL DEMANDED

25.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on each and every claim as pleaded herein.

## PARTIES

26.    Plaintiff earned a bachelors' degree in architecture from Pratt Institute in 2003, and is licensed as an architect in New York State, Florida, Minnesota, and South Carolina.

27.    Between February 2009 through June 2016, at which time he was terminated without any process for whistleblowing, Plaintiff was a loyal civil servant, having been employed by Defendant City as a construction manager for the New York City Department of Parks and Recreation; as a project coordinator in the Energy Management Unit of the New York City Department of Corrections ("DOC"); as the DOC Engineering Audit Officer; and as Deputy Borough Commissioner, Queens, for the New York City Department of Buildings.

28.    Defendant THE CITY OF NEW YORK (the "City"), at all times discussed herein, was and is a domestic municipal corporation, duly organized under and by virtue of the laws of the State of New York, was and is a "person" subject to suit under 42 U.S.C. §1983, and was and is responsible for the regulation and operation of its various agencies including ACS and DOI; and for assuring that, *inter alia*, ACS and DOI, remain in compliance with all Federal, State and local laws, rules and regulations including those that govern approving vendors, approving payments to said vendors and assuring that hiring and firing decisions are not made in violation of legal and constitutional rights.

29.    Defendant ERIC BRETTSCHNEIDER ("Brettschneider"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and is ACS's First Deputy Commissioner, a second ranking person in that agency of Defendant City, appointed as such by the Commissioner thereof.

30.    Defendant MITCH GIPSON ("Gipson"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and

is ACS's Deputy Commissioner of Administration, a high-ranking person in that agency of Defendant City, appointed as such by the Commissioner thereof.

31.     Defendant SUSAN NUCCIO ("Nuccio"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and is ACS's Deputy Commissioner for Financial Services, a high-ranking person in that agency of Defendant City, appointed as such by the Commissioner thereof.

32.     Defendant JOSEPH CARDIERI, ESQ. ("Cardieri"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and is ACS's Deputy Commissioner/General Counsel, a high-ranking person in that agency of Defendant City, appointed as such by the Commissioner thereof.

33.     Defendant WILLIE MAYE, JR. ("Maye"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and is ACS's Director of Employment Services, a high-ranking person in that agency of Defendant City.

34.     Defendant ANNA COLARES ("Colares"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and is Assistant Commissioner for Facilities at ACS, a high-ranking person in that agency of Defendant City.

35.     Defendant DEBORA MACK ("Mack"), is a natural person, was and is a "person" subject to suit under 42 U.S.C. §1983, was and is, at all times discussed herein, was and is Chief of Staff to ACS's First Deputy Commissioner, a high-ranking person in that agency of Defendant City.

7

36.     Defendants JOHN AND JANE DOES NOS. 1-10 are persons whose identities are currently unknown to Plaintiff.   Plaintiff shall seek to amend the instant complaint to add these John and Jane Does as named defendants as their identities and culpability for the events complained of herein are revealed.

## NATURE OF THE ACTION

37.     The Complaint, pursuant to 42 U.S.C. §1983, asserts claims sounding in the Fifth and Fourteenth Amendments of the United States Constitution.

38.     The Complaint also asserts claims of wrongful discharge based upon the whistle-blower protection act applicable to the public sector in New York, Civil Service Law 75-b.

39.     The Complaint also asserts a taxpayer action alleging violation of the General Municipal Law ("GML") § 51.

40.     Plaintiff brings his claims because Defendants took adverse employment action against him, after he made detailed reports to defendants of a myriad of instances of mismanagement, irregularities and protocol violations in ACS' management of construction contracts – thereby fulfilling the mandates of his job description.

41.     In retaliation therefor, ACS first demoted him and then terminated him, without following the process required by law therefor, and in retaliation for his whistle-blowing activities, e.g. his reports of his findings of waste and abuse at ACS and in retaliation for reporting his demotion as well as the underlying circumstances to the New York City Department of Investigation ("DOI") prior to his discharge.

42.     Defendants unilaterally fired Plaintiff during his minimum period of probation without proffering formal charges against Plaintiff, and providing notice and a hearing, with a

full range of procedural rights and protections, as required by law; and without permitting Plaintiff to be represented by legal representation against any adverse employment action.

43.    These unlawful actions by Defendants are the predicate for all of Plaintiff' causes of action as pleaded herein.

## APPLICABLE STATUTES, REGULATIONS
## AND CONSTITUTIONAL PROVISIONS

44.    The Fifth and Fourteenth Amendments to the United States Constitution guarantee the right of any and all people to be free of the deprivation of life, liberty or property without due process of law, and Section 1 of the Fourteenth Amendment guarantees every person within a state of equal protection of the laws.

45.    42 U.S.C. § 1983 provides for a civil private right of action for the deprivation of civil rights by any person acting under color of law.

46.    42 U.S.C. § 1988 provides for the Court, in its discretion, to award attorney's fees to the prevailing party.

47.    Civil Service Law ("CSL") § 63, in conjunction with other provisions, defines the probationary term of public employees and permits the state civil service commission to promulgate rules for the conditions and extent of probationary service.  See 4 NYCRR §4.5, discussed below.

48.    CSL § 75 is a state law which protects public employees from discharge and/or disciplinary action, and provides for formal charges, notice, a hearing upon stated charges, and the right to representation prior to removal of, or imposition of, any disciplinary penalty upon a covered public employee, which includes probationary employees within their minimum period of probation.

49.     CSL § 75-b is a state law which prohibits retaliatory action by public employers against employees who are "whistleblowers" and/or who have sought whistleblower protection.

50.     Labor Law ("LL") § 740 is a state law which prohibits retaliatory action by private employers against employees who are "whistleblowers" and/or who have sought whistleblower protection.

51.     GML § 51 is a state law in which taxpayers may maintain an action against all officers and other persons acting on behalf of any county, to prevent any illegal official act, and to prevent waste and abuse of the public fund.

52.     4 NYCRR § 4.5 is a rule and regulation appended to the Civil Service Law in New York State, promulgated pursuant to CSL § 63, which declares that every probationary period shall include a minimum and maximum term; declares that, unless otherwise provided, the minimum probationary term is eight weeks; and states that "[i]f the conduct or performance of a probationer is not satisfactory, his or her employment may be terminated at any time after eight weeks and before completion of the maximum period of probation."

## FACTS

53.     On or about May 16, 2016, Plaintiff transferred from his role as Deputy Borough Commissioner of the New York City Department of Buildings ("DOB") to ACS to serve, in a provisional status, as its Engineering Audit Officer ("EAO").

54.     This role was established pursuant to Internal Controls and Accountability Directive #7 ("Directive #7") of the Office of the New York City Comptroller (the "Comptroller") for agencies of Defendant City that regularly maintain contracts for construction, equipment and/or construction-related services.

55.     Plaintiff's responsibility in this role was to audit all payment requests for construction, equipment and construction-related services, prior to processing any payments to vendors through the City's Financial Management System ("FMS").  This process allows the City and Taxpayers assurances that they have received value for the work invoiced.

56.     According to the 2016 New York City Mayor's Management Report, capital commitments for ACS in 2016 were $10.2 million.

57.     The EAO role had been created in response to a Corrective Action Plan established by ACS in response to previously failed audits.

58.     The promulgation of this plan was an explicit acknowledgement that ACS had failed woefully in maintaining proper control of its construction contracts.

59.     The *raison d'etre* of the EAO position was to ensure ACS' compliance with all applicable regulations and controls pertaining to contracting, invoicing, payment and completion of work in the field.

60.     Upon starting as EAO at ACS, Plaintiff met with Defendant Gipson, who told him about that he was playing catchup in bringing order to ACS' Division of Administration, and that there was an incredible need for an EAO because there were structural flaws in ACS' processes (or lack thereof) in monitoring contracts.

61.     In order to comply with Directive #7, the EAO was to review payment requisitions prior to delivery to the ACS Payment Unit for processing and disbursement; and was to integrate routine performance of said review into the operating procedures of the agency.

62.     In addition, an EAO has the authority to contact the Comptroller's Chief Engineer for consultation and advice in connection with audits, and to contact the Mayor's Office of Contract Services ("MOCS") with concerns about contract administration and execution.

63.     The EAO was to preserve its independence and integrity by reporting directly to the agency head or an assigned designee not directly responsible for the agency's design, construction or operational functions or responsibilities.

64.     As a result, it was the duty of an EAO to bring any irregularities to the attention of superiors in ACS, to the Comptroller, and to MOCS.

65.     Accordingly, when Plaintiff was appointed in his provisional position as EAO at ACS, he reported directly to defendant Brettschneider.

66.     Plaintiff had prior experience in an EAO role with DOC in 2012-13.

67.     In that time, Plaintiff discovered and corrected many instances of waste, fraud and abuse at DOC, caused recoupment of several million dollars in city funds and developed his relationships with MOCS and the Comptroller's office.

68.     As a result, Plaintiff was well equipped to perform the EAO role at ACS.

69.     Shortly after commencing work at ACS, on or about May 16, 2016, Plaintiff, identified systemic flaws, mismanagement, irregularities and protocol violations (the "ACS Irregularities") in the manner in which ACS dealt with its contract arrangements, including things that may have amounted to waste and/or fraud at the taxpayers' expense.

70.     Upon information and belief, the ACS Irregularities identified by Plaintiff included, without limitation:

> a) Preferential treatment to certain vendors and facilities including, without limitation, Jeremy Kohomban, and his non-profit organization, the Children's Village (Children's Village was performing work per the direction of ACS at Kohomban's leased facility located at 207-01 Jamaica Avenue, Jamaica, New York 11428), which included, but was not limited to, payment of the facility's lease, overlooking the failure of the plumbing contractor to obtain a permit for capping and removal of plumbing fixtures as listed on DOB application number 420951937 which was a partially permitted application, authorization of payment for work without a

registered contract and authorization of payment for fire alarm work which was never completed. <u>See</u> ¶ 68 below.

b) Release of payments on payment requisitions without the proper documentation therefor;

c) Possible payment of invoices which, upon information and belief had not even been received by ACS; Plaintiff identified requisitions which were not supported in their entirety by invoices and in some cases, payment may have been made;

d) Payment for work that was invoiced, but not completed;

e) Permitting work to be done without a contract registered with the New York City Comptroller, and approving payment thereon;

f) Overpayment for work completed, beyond the proper cost of the work,

g) Prevention by some or all individual defendants of preparation of engineering estimates for the value of work to be completed such that Plaintiff could not analyze whether the value of work matched the payment made;

h) Mismanagement of Federal funds for Superstorm Sandy relief, by not following city protocols and procedures, specifically by defendant Gipson and others who report to him, and discussed in more detail below in ¶¶ 69-84;

i) Improperly paying for construction work and construction procurement through the expense budget instead of the capital budget;

j) Unencumbering funds randomly, so vendors were in danger of not always having funds available in their accounts to pay for work properly performed and invoiced;

k) Failure to keep on file updated certificates of insurance for vendors, as required;

l) Failure to ensure registration of vendors as subcontractors in the City's Payee Information Portal, as required by rule;

m) Failure to guard against potential compliance concerns in relation to rules relating to Minority and Women-Owned Business Enterprise ("M/WBE"), as most construction work was being performed as subcontracted work under human-services provider contracts, who are exempt from M/WBE;

n) Failure to properly track EAO-auditable contracts. Many contracts for Construction/ Equipment and Construction-Related Services were issued through Purchase Order, or subcontracted through a service provider. Contract Registrations were announced through a daily email. The information in the emails was often insufficient for EAO to determine audit applicability. The EAO is required to read every contract registered by the Agency Chief Contracting Officer's office on a daily basis and request feedback from others on the scope of work on these contracts, to even begin an analysis. By employing such an improper protocol, ACS was making it as hard as possible for its EAO to perform audits;

o) Use of payment forms non-compliant with requirements of the City Standard Construction Contract, Procurement Policy Board ("PBB") Rules, and Comptroller Directive # 7;

p) Employment of Project Managers not familiar with the demands of their roles and failure to properly train them to be familiar with the same;

q) Use of Renovation Funds Release Authorization ("RFRA") and DAPRA payment processes, which were flagged by Plaintiff as in violation of PPB rules. EAO was required to review invoices for payment prior to processing City funds through the Financial Management System ("FMS"), however, ACS was channeling funds through FMS before the work was done, thus bypassing the standard payment process and the EAO, and thereby placing the City at risk for waste, fraud and abuse. This issue was brought to the attention of numerous ACS offices including General Counsel and First Deputy Commissioner as well as representatives of the Comptroller's office;

r) Failure to uniformly review subcontractor proposals for appropriate cost. ACS failed to impose internal controls to ascertain whether an estimate or proposal for construction work was accurate, fair or equitable, which failure placed the City at risk for waste, fraud and abuse;

s) Failure to use the City's Standard Construction Contract boilerplate causing many problems with subcontract work, including frequent conflicts between terms of general contracts and subcontracts; during Plaintiff's tenure as EAO, of the many contracts he reviewed, very few used this required form.

71.    One of the primary units at ACS being audited by Plaintiff was the Facilities Unit, which was overseen by Defendant Colares.

72.    Defendant Colares was the person who signed payment requisitions which come into that unit.

73.     The Facilities Unit's acts and omissions fell within many of the above categories including, without limitation, approving payments for requisitions which did not have appropriate support material; signing payment requisitions for, *inter alia*, fire alarm work at the above referenced Children's Village location, which was, upon information and belief, never completed; failing to ensure that engineers and project managers consistently visited sites in the field, as required for monitoring compliance, and/or not keeping appropriate logs of such visits; etc.

74.     An example of mismanagement by ACS, including, without limitation defendant Gipson, was referred to in ¶ 67(h) above. This related to a Federally funded Police Athletic League ("PAL") project (hereinafter referred to as the "PAL Project") for construction at a facility known as *La Puerta Abierta* (which means "The Open Door").

75.     The Federal funding was given as part of Superstorm Sandy relief in an approved amount of $4,717,837.75.

76.     In connection with the PAL Project, ACS brokered a subcontractor agreement with a contractor called Balaton Construction ("Balaton") and a design professional named Fred Lott ("Lott"), for which ACS paid with City dollars (backed by Federal funds), for an interior and exterior renovation to and enlargement of an existing daycare facility.

77.     ACS departed from City procurement protocol by permitting PAL to retain Balaton and Lott as subcontractors pursuant to an amendment to a PAL human services contract intended for child-care, adding a line to provide funding for Superstorm Sandy recovery and renovation work, thereby permitting subcontractor agreements for architectural and general construction services.

15

78.     This contract amendment was added as part of an application for a Federal Grant and overlooked procurement and contract guidelines for City-Funded Capital Projects.

79.     Moreover, ACS departed from City procurement policy by managing the *La Puerta Abierta* project despite the fact that it was not party to the construction subcontractor agreement between PAL and Balaton.

80.     Upon information and belief, neither Balaton Construction nor Fred Lott were approved as subcontractors in FMS/PIP when Plaintiff was at ACS.

81.     This non-compliant subcontractractor arrangement impermissibly empowered PAL to employ entities who were not approved as subcontractors in FMS/PIP, who were, as discussed below in ¶¶ 81-84, undercapitalized to an extent whereby they were unable to pay the required surety bond to protect the City, to bypass M/WBE requirements as described above in ¶ 67(m) above and to avoid separate bidding and awards for the different trades on a project (avoiding "Wick's Law").

82.     Upon information and belief, the estimated total cost of the project quoted to DOB was more than a million dollars less than the contract value awarded to Balaton.

83.     Moreover, ACS again departed from City procurement protocol by attempting to pay for work that had not been completed, whereby it was funneling the money through FMS into an escrow account, out of which it would pay vendors when the work was complete.

84.     As EAO, Plaintiff ultimately denied this request as improper; protocol was for the funds to be released to the vendors through FMS when the work was complete.

85.     To that end, Defendant Gipson, at a meeting with Plaintiff, suggested that ACS prepay to Balaton $91,361, the amount of its performance and payment bonds – i.e. the surety bonds that each contractor with the City must post in order to ensure that the contract will be

16

completed in accordance with the terms and conditions of the contract, and to ensure that its suppliers and subcontractors do not go unpaid for work performed under the contract.

86.    Defendant Gipson did this in response to concerns raised by his subordinates that Balaton did not have the financial capability to these bonds.

87.    Defendant Gipson's suggestion, that ACS prepay the amount of the bond to Balaton, improperly subverted the intent of having the contractor post the bond in the first instance, and, if made, might have been a fraudulent payment to Balaton of City funds.

88.    ACS, by defendant Gipson, advocated strongly for this prepayment, and it is likely that such a departure for City protocol occurred, but Plaintiff was wrongfully discharged prior to the completion of the approval process.

89.    Moreover, as this project was a Federally-funded Superstorm Sandy related project, the use of RFRA/DAPRA payment mechanism was problematic and placed the City at financial risk of loss.

90.    Plaintiff transparently communicated his findings regarding the ACS Irregularities to his superiors and colleagues.

91.    Plaintiff's means of communicating same included several meetings and conversations, numerous emails, and a litany of phone calls with, *inter alia*, defendants Brettschneider, Gipson, Nuccio, Cardieri, Mack and Colares.

92.    Plaintiff was also in constant contact with the Comptroller's Office, specifically the Bureau of Engineering, regarding the ACS Irregularities.

93.    Defendants responded to Plaintiff's reports with hostile and retaliatory conduct.

94.    Such hostile conduct included, without limitation, imposing limitations on Plaintiff's duties, barring him from visiting construction sites, cancelling attendance at certain

meetings relevant to EAO duties, requiring clearance from supervisors for any appointments, and prohibiting Plaintiff from meeting with others in the engineering and construction community.

95.    Significantly, Defendant Brettschneider prevented Plaintiff from meeting with the ACS Payment Unit and Facilities Unit and therefore, Plaintiff, though EAO, was unable to ascertain the amount of total payments which had been made for active contracts.

96.    Moreover, Defendant Brettschneider began to micromanage Plaintiff and require a carbon copy of all Plaintiff ACS emails.

97.    Defendants' attempts to neuter the EAO role and Plaintiff's performance thereof were in direct contravention of Directive # 7 and the ACS Corrective Action Plan, and of the purpose and intent of the office of the EAO.

98.    Following Plaintiff's reports concerning the ACS Irregularities, on June 17, 2016 at 8:41 AM, Plaintiff received the following email from Defendant Mack: "Hi Adam, can you please send me a list by 10am this morning of all the findings that you have discovered that you have concerns about.  Thank you."

99.    Plaintiff responded by 9:27 AM on June 17, 2016 with a significant list of the ACS Irregularities, including most of those set forth above.

100.    That same day, in response thereto, after only a month on the job, ACS, by Defendants Brettschneider, Gipson and Maye, demoted Plaintiff from management to a civil service, non-managerial position and gave him a significant pay-cut.

101.    The pretext given for this demotion and 20% reduction in pay was that defendant Brettschneider did not feel capable of supervising such a technical role, as he had very little experience with construction.

18

102.    Defendant Brettschneider also averred that ACS was rushed to create the EAO position and that he had not understood the requirements.

103.    Following Plaintiff's demotion, Defendants eliminated the independent and autonomous EAO position.

104.    Defendant Brettschneider's explanation was an excuse and pretext to eliminate the only watchdog to his and others' misconduct in contracting, procurement and payment as, upon information and belief, the EAO position had existed unfilled for over a year before Plaintiff was installed.

105.    This demotion, however, had the effect of changing Plaintiff's status from a provisional appointment to a permanent appointment, with a probationary period term commencing on Plaintiff's first day in his new role, June 20, 2016, running through May 15, 2017.

106.    Upon information and belief, Plaintiff's demotion and/or transfer to a lower position and salary was retaliation against Plaintiff for reporting the ACS Irregularities to his superiors and the Comptroller's Office, a function of the EAO position contemplated and required by his job description.

107.    Following his demotion, Plaintiff requested, pursuant to the New York Freedom of Information Law ("FOIL"), Public Officer's Law § 87, *et seq.*, documents setting forth the reasons for Plaintiff's demotion.

108.    Also, on or about June 18, 2016, Plaintiff filled out an online complaint form maintained by DOI.

109.    Thereby, Plaintiff formally sought whistleblower protection from DOI, based upon ACS' retaliatory action in response to his reports of misconduct at ACS.

110.    Plaintiff thereafter followed up with DOI by email on or about June 19, 2016, stating clearly that he was seeking whistleblower protection.

111.    On or about June 21, 2016, Plaintiff also contacted other officials at various other City agencies, including, without limitation, officials at MOCS.

112.    Exactly one week after Plaintiff's demotion and only four (4) days into his probationary period, on June 24, 2016, ACS summarily fired him.

113.    Plaintiff was discharged by defendant Maye.

114.    Plaintiff was not provided advance notice of his discharge.

115.    Plaintiff was not provided any charges or reasons, formal or otherwise, for his discharge prior thereto.

116.    Plaintiff was not provided a hearing with regard to his discharge.

117.    Plaintiff was not provided with a rationale for his discharge, at his termination meeting or thereafter.

118.    Plaintiff was entitled to formal charges, notice and a hearing at which to challenge any adverse action, up to and including discharge; none of which was provided.

119.    Public employees within the minimum period of probation as defined by CSL § 63 and 4 NYCRR § 4.5(a) are entitled to full procedural due process protections.

120.    Defendants were, as a result, *required* to provide Plaintiff with formal charges, notice and a hearing, with the array of procedural safeguards described herein.

121.    By refusing or failing to do so, and by then depriving Plaintiff of his property interests, all Defendants subjected Plaintiff, or caused Plaintiff to be subjected, to deprivations of rights protected by the United States Constitution.

122.    In addition, upon information and belief, Plaintiff's discharge was in retaliation for commencing a DOI investigation and for raising significant concerns related to the practices of ACS including, without limitation, reporting the ACS Irregularities and seeking whistleblower protection from DOI.

123.    In furtherance of the whistleblower protection previously sought, on or about June 24 and 25, 2016, Plaintiff informed DOI and MOCS of his termination and provided notice that the adverse employment action had been done in the face of Plaintiff's already-asserted whistleblower protection.

124.    Plaintiff has continued to follow up with DOI, has met with DOI investigators, and has received assurances from DOI that its investigation is ongoing; nevertheless, DOI has not brought charges, announced findings, or otherwise signaled that its investigation has or will result in any concrete action to address the wrongs done to Plaintiff.

125.    Upon information and belief, ACS's conduct described above, both as it relates to Plaintiff's demotion/transfer to a lower position and to Plaintiff's discharge, is indicative of an attempt to cover-up the ACS Irregularities – and, given the lack of institutional controls at ACS, perhaps other instances of improper conduct, not yet discovered.

126.    Upon information and belief, Plaintiff's demotion and termination were in retaliation for Plaintiff reporting the ACS Irregularities and seeking whistleblower protection.

127.    Plaintiff's demotion was retaliatory and in violation of CSL § 75-b.

128.    Plaintiff's termination was unlawful, without proper process and retaliatory, in violation of CSL § 75-b.

129.    Moreover, ACS's unlawful actions, in demoting and then terminating Plaintiff, caused acute physical and mental stress to him.

130.    On the day of Plaintiff's wrongful discharge, June 24, 2016, Plaintiff was taken to the emergency room by a complete stranger because of numbness in his left arm and tingling in his hand, which symptoms have been opined to be caused by the stress related to his experience at ACS.

131.    The damages complained of herein all flow from said deprivations.

132.    Plaintiff has been damaged thereby in an amount to be determined at trial, but alleged to be in excess of $7,000,000.00

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: VIOLATION OF DUE PROCESS CLAUSE
**42 U.S.C. § 1983, Fifth and Fourteenth Amendments of the United States Constitution As Against Individual Defendants Brettschneider, Gipson, Nuccio, Cardieri, Maye. Colares, Mack and/or John and Jane Does No. 1-10**

133.    Paragraphs 1 through 132 are incorporated by reference as if set forth fully herein.

134.    Through the acts complained of herein, defendants Brettschneider, Gipson, Nuccio, Cardieri, Maye, Colares, Mack, and/or John and Jane Does No. 1-10 deprived Plaintiff of a property right, in the form of his minimum period of probation in his post-demotion position as Architect L-3, to which he was entitled at law.

135.    Through the acts complained of herein, defendants Brettschneider, Gipson, Nuccio, Cardieri, Maye, Colares, Mack, and/or John and Jane Does No. 1-10 deprived Plaintiff of said property interest, in derogation of his right to procedural due process of law, to which he had an absolute entitlement as per CSL §§ 63, 75 and/or 4 NYCRR § 4.5, and/or established applicable caselaw, e.g. the presentment of formal charges for termination of his employment at ACS, and a hearing to adjudicate same, with all of the attendant procedural safeguards for such a hearing.

136.    Defendants Brettschneider, Gipson, Nuccio, Cardieri, Maye, Colares, Mack, and/or John and Jane Does No. 1-10 caused said deprivation of Plaintiff's right to procedural due process under color of law.

137.    By virtue of the foregoing conduct, Defendants have violated Plaintiff's rights to procedural due process of law conferred by the Fifth and Fourteenth Amendments to the United States Constitution, and Plaintiff is entitled to such relief as the Court finds appropriate, including, but not limited to, declaratory relief, compensatory damages, and punitive damages.

138.    Plaintiff is also entitled to an award for reasonable expenses incurred in this litigation, declaratory relief, compensatory damages, and punitive damages, as per 42 U.S.C. § 1988.

### SECOND CLAIM FOR RELIEF: VIOLATION OF EQUAL PROTECTION CLAUSE
**42 U.S.C. § 1983, Fourteenth Amendments of the United States Constitution**
**As Against Individual Defendants Brettschneider, Gipson, Nuccio,**
**Cardieri, Maye. Colares, Mack and/or John and Jane Does No. 1-10**

139.    Paragraphs 1 through 138 are incorporated by reference as if set forth fully herein.

140.    Plaintiff is a member of a class of private actors subject to the enforcement of the law by Defendants.

141.    Defendants have a duty to act evenhandedly in administering the laws and regulations governing employment in New York City, as between Plaintiff and others who are similarly situated.

142.    Through the acts complained of herein, Defendants intentionally, recklessly and/or negligently treated Plaintiff differently than others similarly situated, e.g., permanent employees amidst their minimum periods of probation as well as all other permanent employees covered by CSL § 75, by wrongfully discharging Plaintiff in an irregular and improper manner, summarily terminating his employment four days into his probationary period, instead of

proffering formal charges and prosecuting him in a formal hearing, as mandated by law and as routinely done with other employees at ACS similarly situated.

143.    Moreover, through the acts complained of herein, Defendants intentionally, recklessly and/or negligently treated Plaintiff differently than others similarly situated, e.g. whistleblowers, by retaliating against him with a demotion and termination of his employment because he engaged in his statutorily protected right to be a whistleblower by reporting the ACS Irregularities to his colleagues and superiors and thereafter reporting his demotion and seeking whistleblower protection to DOI.

144.    There is no rational basis for the difference in treatment between Plaintiff and others similarly situated.

145.    As a result, Defendants have deprived Plaintiff of his rights to equal protection under the law, as secured to Plaintiff by the Fourteenth Amendments to the United States Constitution.

146.    Plaintiff is entitled to such relief as the Court finds to be appropriate, including, but not limited to, declaratory relief, compensatory damages, and punitive damages.

147.    Plaintiff is also entitled to an award for reasonable expenses incurred in this litigation, including reasonable attorneys' fees and expert fees, as per 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF: MUNICIPAL**
**LIABILITY FOR CONSTITUTIONAL VIOLATIONS**
**42 U.S.C. § 1983 – *Monell* Claim As Against the City of New York**

148.    Paragraphs 1 through 147 are incorporated by reference as if set forth fully herein.

149.    The City directly caused the constitutional violations suffered by Plaintiff and deprivations of Plaintiff's right to procedural due process under color of law and is liable for the

damages suffered by Plaintiff as a result of the conduct of its agencies and agents who include, without limitation, the individual named defendants, as well as John and Jane Does No. 1-10.

150.    The conduct complained of herein engaged in by the City's agencies, agents and representatives was a direct consequence of policies and practices of the City.

151.    At all times relevant to this complaint, the City, acting through ACS and/or DOI, had in effect policies, practices and customs that condoned and fostered the unconstitutional conduct of the individual defendants, as well as John and Jane Does No. 1-10, and were the direct and proximate cause of the damages and injuries complained of herein.

152.    The city so deprived Plaintiff of his right to procedural due process as a matter of official municipal policy, misapplication of policy and/or custom by means of a policy, misapplication of policy and/or custom so pervasive and widespread as to practically have force of law, e.g., the litany of litigation surrounding Agencies taking advantage of the provisional, temporary and probationary employee system so as to minimize the number of tenured employees at the City's agencies, including ACS.

153.    As a result of this conduct, the City as a matter of official municipal policy, misapplication of policy and/or custom by means of a policy, misapplication of policy and/or custom has minimized the number of permanent, tenured employees to minimize the need to provide due process in violation of applicable law including CSL § 75.

154.    It has done so to such an extent that its agents, including, without limitation the individual named defendants, as well as John and Jane Does No. 1-10 have failed to provide appropriate process even to those entitled, i.e. those within their minimum periods of probation, such as Plainitff, in violation of applicable law including CSL § 75.

155.    Despite the fact that the City and its agents, including, without limitation, the individual named defendants, as well as John and Jane Does No. 1-10, knew or should have known of the illegality of its conduct of terminating certain employees who were entitled to formal charges, notice and a hearing, without such appropriate process, the City failed to take any remedial, investigational or prosecutorial action.

156.    This policy and/or custom of the City is evidenced by the fact that Plaintiff filed a complaint seeking whistleblower protection from DOI after he was demoted, but before he was terminated, and DOI has failed to do anything other than acknowledge that an investigation is ongoing.

157.    The conduct complained of herein engaged in by the City, the City's agencies, agents and representatives demonstrate a policy and/or custom of the City to violate the law by permitting its agents to fail to provide appropriate procedural due process to permanent employees within their minimum periods of probation, despite their entitlement to the same.

158.    The conduct complained of herein engaged in by the City, the City's agencies, agent and representatives demonstrate a policy and/or custom of the City, by its investigatory agencies to inadequately investigate and prosecute its sister agencies for violations of applicable whistleblower protection laws, e.g. CSL § 75-b, all-the-while doing nothing, as such employees are discharged with insufficient process.

159.    By virtue of the foregoing Plaintiff is entitled to such relief as the Court finds to be appropriate, including, but not limited to, declaratory relief, compensatory damages, and punitive damages.

160.    Plaintiff is also entitled to an award for reasonable expenses incurred in this litigation, including reasonable attorneys' fees and expert fees, as per 42 U.S.C. § 1988.

## FOURTH CLAIM: STATE WHISTLEBLOWER WRONGFUL DISCHARGE CLAIM
### Civil Service Law § 75-b As Against all Defendants

161.    Paragraphs 1 through 160 are incorporated by reference as if set forth fully herein.

162.    As discussed above, upon assuming his position as EAO at ACS, Plaintiff began to identify areas of malfeasance, misfeasance, and nonfeasance, including those items identified as the ACS Irregularities above.

163.    Plaintiff's job as EAO was to audit ACS' contracting, procurement and all payment requests for construction, equipment and construction related services, prior to processing any payments to vendors through the City's Financial Management System ("FMS")

164.    As discussed above, the EAO role had been created pursuant to an ACS Corrective Action Plan which was in response to Comptroller's Directive #7 based upon failed audits at ACS.

165.    The EAO role was a necessary addition to ACS's oversight and auditing to correct its improper practices.

166.    Upon identifying the ACS Irregularities, Plaintiff knew or reasonably believed that the ACS Irregularities constituted potential violations of Federal and State Law as well as applicable, rules, regulations and codes to which the City is subject and therefore were improper government actions as set forth in CSL § 75-b.

167.    As a result, Plaintiff informed his superiors about the ACS Irregularities.

168.    By informing his superiors about the ACS Irregularities, Plaintiff had become a a person covered and protected by CLS § 75-b.

169.    Instead of complying with their statutory duties to heed the reports of the EAO and correct the ACS Irregularities, ACS and the individual defendants closed ranks and pushed back and retaliated against Plaintiff.

170.    In retaliation for reporting the ACS Irregularities, the City, by and through ACS and all remaining Defendants subjected Plaintiff to increased scrutiny, by limiting Plaintiff's duties, barring him from visiting construction sites, denying his attendance at certain meetings relevant to EAO duties, requiring clearance from supervisors for any appointments and prohibiting him from interacting with others in the engineering and construction community.

171.    In further retaliation for reporting the ACS Irregularities, the City by ACS and all remaining Defendants, demoted Plaintiff from his management position on or about June 17, 2016, and subjected him to a 20% pay decrease.

172.    In further retaliation for reporting the ACS Irregularities, as well as in retaliation for filing the DOI complaint seeking whistleblower protection and the FOIL request for justification surrounding his demotion, the City by ACS and all remaining Defendants, ultimately terminated Plaintiff's employment at ACS on or about June 24, 2016, without formal charges, notice, a hearing or the benefit of adequate representation.

173.    Inexplicably, despite the fact that the issuance of Directive #7 and the ACS Corrective Action Plan showed that ACS, as an institution, was badly in need of control, oversight, and corrective action, ACS eliminated the EAO position entirely.

174.    As a direct and proximate result of Defendnats' aforementioned conduct against Plaintiff, Plaintiff has suffered both economic and non-economic damages including mental anguish and emotional distress.

175.    Defendants' conduct was intentional, illegal, wanton, willful and malicious.

176.    As a result of the willful and wanton disregard for Plaintiff's rights, Plaintiff is entitled to Punitive Damages in an amount to be determined by the Court.

177.    By virtue of the foregoing Plaintiff is entitled to such relief as the Court finds to be appropriate, including, but not limited to, declaratory relief, compensatory damages, and punitive damages.

**FIFTH CLAIM: STATE TAXPAYER ACTION**
**State Statutory Claim Pursuant to New York State**
**General Municipal Law § 51 – As Against the City of New York**

178.    Paragraphs 1 through 177 are incorporated by reference as if set forth fully herein.

179.    Plaintiff is domiciled in the City, in Kings County.

180.    Plaintiff pays taxes to the City of New York in excess of $1,000 per year, is thus considered a citizen, and therefore, has standing to interpose and prosecute a taxpayer action pursuant to General Municipal Law ("GML") § 51, and an action for declaratory and equitable relief pursuant to New York State Finance Law ("FL") § 123-B.

181.    ACS has a duty to remain in compliance with the law and to not act in any way which would otherwise be illegal, or would constitute waste, fraud or abuse.

182.    ACS receives taxpayer funds to, *inter alia,* perform these and its other functions.

183.    ACS, by its officials including, without limitation Brettschneider, Gipson, Nuccio, Cardieri, Maye, Colares, Mack, and/or John and Jane Does No. 1-10, engaged in illegality, waste, fraud and/or abuse by engaging in and/or encouraging the ACS Irregularities.

184.    Such practices continue and have continued unchecked long after Plaintiff provided notice that the ACS Irregularities were ongoing.

185.    Despite the fact the EAO was created to combat such practices in response to Directive #7 and the ACS Corrective Action Plan, and that Plaintiff, a licensed architect and former manager of construction contracts on behalf of other City agencies, with unassailable credentials to perform the work of the EAO, had been hired to execute this function, Defendants

pushed back and retaliated against Plaintiff, demoted and then terminated him, and eliminated the EAO position.

186.    Such practices by ACS constitute a waste of and/or injury to the public funds, as vast sums have been expended in overpayments, in payment for work that was never done, for payment requisitions without sufficient supporting documentation, and for numerous other anomalies, including but not necessarily limited to the ACS Irregularities set forth above.

187.    The conduct of Defendants as set forth within is unlawful and imperils the interest of the public in ensuring that its tax dollars are expended appropriately.

188.    The City, through its agency ACS, has a duty to ensure that its expenditures are lawful, and to act affirmatively to protect the citizens of New York City from waste of the public fisc, by, *inter alia,* monitoring its own activities for impropriety and inefficiency.

189.    ACS receives taxpayer funds, including sums to pay for the office of the EAO, to comply with this obligation.

190.    Despite Plaintiff's prompt and thorough reports of the ACS Irregularities, ACS refused to take any action to correct these instances of fraud, abuse, and waste, despite its legal duty to do so.

191.    Defendants' response to Plaintiff's reports was not to heed them and so protect the public fisc, but rather to demote and then terminate Plaintiff, in violation of CSL § 75-b.

192.    By shirking its legal duties and turning a blind eye towards its own illegal and/or improper acts, ACS has engaged in conduct which constitutes a waste and/or injury to the public funds by refusing to use those funds and its resources to perform its legal duty.

193.    In addition, the City, via DOI, by failing to investigate the allegations of illegality noticed by Plaintiff and correcting same, and therefore not treating all those under its jurisdiction

fairly, equitably and equally, has engaged in acts which are illegal and damaging to public interests.

194.    All of the individual defendants hold positions in ACS specifically related to insuring that ACS funding is properly expended; nevertheless, each of them failed to make inquiry or otherwise perform even the most basic functions of oversight and control.  To the contrary, they defenestrated the only person attempting to protect public funds: Plaintiff.

195.    Therefore, the individual Defendants engaged in conduct which constitutes a waste and/or injury to the public funds by refusing to use those funds and its resources to further the lawful mission of ACS.

196.    By virtue of the conduct contained herein, such practices by all Defendants constitute illegal conduct and conduct which imperils the public interests, i.e. waste, fraud and/or abuse of ACS expenditures in the form of the ACS Irregularities.

197.    By virtue of the foregoing conduct, Plaintiffs are entitled to such relief as the Court finds to be appropriate including, without limitation, declaratory relief, injunctive relief, ordering the creation of a fund to remediate all of the foregoing wastes to the public fund and illegalities, and the costs and expenses of this action including attorneys' and expert fees.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

(a)    A declaration that the Defendants' actions were illegal and unconstitutional as violating the Fifth and Fourteenth Amendments of the United States Constitution;

(b)    A declaration that Defendants intentionally, under color of law, deprived Plaintiff of rights secured to him by the Fifth and Fourteenth Amendments of the United States Constitution;

(c)    A declaration that Defendants retaliated against Plaintiff, in violation of CSL §
       75-b, by demoting then discharging Plaintiff and that such retaliation was
       wrongful;

(c)    An award to Plaintiff of compensatory damages against all Defendants, in an
       amount to be determined at trial, but believed to be at least $7,000,000.00;

(d)    An award to Plaintiff of punitive damages against Defendants for illegal and
       unconstitutional acts;

(e)    The creation of a fund to remediate all of the identified wastes to the public fund
       and illegalities;

(f)    An award to Plaintiff of reasonable expenses of this litigation, including, but not
       limited to, attorneys' fees and expert fees; and

(g)    Such other and further relief as this Court may deem just and appropriate.


Dated: New York, New York              Respectfully submitted,
       April 18, 2017


                                       KLEIN SLOWIK PLLC
                                       By: DANIEL J. SCHNEIDER
                                       90 Broad Street, Suite 602
                                       New York, NY 10004
                                       (212) 564-7560
                                       dschneider@buildinglawnyc.com
                                       Attorney ID: DS7366